

**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

_____

*Connecticut Financial Center*      *(203)821-3700*
*157 Church Street, 25ʰ Floor*      *Fax (203) 773-5376*
*New Haven, Connecticut 06510*      *www.justice.gov/usao/ct*

January 17, 2025

United States District Court
District of Connecticut
FILED AT    BRIDGEPORT

1|17|25 _____20
Dinah Milton Kinney, Clerk

By_____
Deputy Clerk

Nadira Clarke, Esq.
Anne M. Carpenter, Esq.
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, DC 20004

> Re:    **United States v. National Water Main Cleaning Company**
>         **Case No. 3:25CR2(KAD)**

Dear Attys. Clarke and Carpenter:

This letter confirms the plea agreement between your client, National Water Main Cleaning Company (the "defendant" or "NWMCC"), and the United States Attorney's Office for the District of Connecticut (the "Government") in this criminal matter.

## THE PLEA AND OFFENSE

In consideration for the benefits offered under this agreement, the defendant agrees to waive its right to be indicted and to plead guilty to a one-count information charging a violation of 33 U.S.C. §§ 1319(c)(2)(A) and 1311(a)—that is, the knowing discharge of a pollutant into the navigable waters of the United States in violation of the Clean Water Act, 33 U.S.C. § 1251 *et seq*. The defendant understands that to be guilty of this offense, the following essential elements must be satisfied:

1. The defendant is a person as defined under the Clean Water Act;

2. The defendant discharged, or caused the discharge of, a pollutant;

3. The discharge was from a point source;

4. The discharge was into a water of the United States;

5. The discharge was made without a permit to discharge the pollutant as authorized under the Clean Water Act; and

*Nadira Clarke, Esq.*
*Anne M. Carpenter, Esq.*
*January 17, 2025*
*Page 2*

6.  The defendant acted knowingly.

## THE PENALTIES

### Probation

The maximum term of probation is five years. 18 U.S.C. § 3561(c)(1).

### Fine

Under 18 U.S.C. § 3571, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) the fine amount specified in the offense of conviction, namely not less than $5,000 nor more than $50,000 per day of violation under 33 U.S.C. § 1319(c)(2)(A); (2) twice the gross gain to the defendant resulting from the offense or twice the gross loss resulting from the offense, whichever is greater; or (3) $500,000 under 18 U.S.C. § 3571(c)(3).

### Special Assessment

In addition, the defendant is obligated by 18 U.S.C. § 3013(a)(2)(B) to pay a special assessment of $400 on each count of conviction. The defendant agrees to pay the special assessment to the Clerk of the Court on the day the guilty plea is accepted.

### Interest, penalties, and fines

Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572(h), (i) and § 3612(g). The defendant reserves the right to request that the Court waive interest and penalties as permitted by statute, and the Government reserves the right to oppose any such request.

## THE SENTENCING GUIDELINES

### Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case. The defendant agrees that the Sentencing Guidelines determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office.

Nadira Clarke, Esq.
Anne M. Carpenter, Esq.
January 17, 2025
Page 3

Application of the Sentencing Guidelines

The Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range.

The parties agree that the applicable Sentencing Guidelines are found in U.S.S.G., Chapter 8. In following the application instructions outlined in U.S.S.G. §§ 8A1.2 and 8C2.1, the parties agree that because this case involves environmental crimes, any criminal fine is governed by the generalized sentencing considerations outlined in U.S.S.G. § 8C2.10.

Stipulation

Pursuant to § 6B1.4 of the Sentencing Guidelines, the defendant and the Government have entered into the attached stipulation, which is a part of this plea agreement. The defendant understands that this stipulation does not set forth all of the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The defendant understands that this stipulation is not binding on the Court. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

Plea Agreement Pursuant to Rule 11(c)(1)(C)

The defendant and the Government agree, pursuant to Fed. R. Crim. P. 11(c)(1)(C), that the following sentence is a reasonable and appropriate sentence, which is sufficient, but not greater than necessary, to achieve the purposes of sentencing in light of the factors set forth under 18 U.S.C. § 3553(a):

(1) the defendant shall pay a criminal fine of $500,000 payable to the Clerk of the Court within 30 days of sentencing;

(2) the defendant shall be placed on probation for a period of three years from the date of sentencing, during which time the defendant shall comply with the Special Conditions of Probation set forth in Appendix A of this Plea Agreement, which shall become part of the Court's Judgment; and

(3) the defendant shall make a $500,000 community service payment to the Connecticut Statewide Supplemental Environmental Project ("SEP") Account (South Central Coastal Watershed Enhancement), managed by the Connecticut Department of Energy and Environmental Protection ("CT DEEP"). This payment shall be used to fund aquatic ecosystem enhancement projects in the South Central Coastal Watershed in Connecticut as selected by CT DEEP consistent with its February 15, 1996, *Policy on Supplemental Environmental Projects*, and in accordance with its *Environmental Equity Policy*, including, but not limited to, river restoration, water quality improvement, dam removal, fish habitat enhancement, sediment removal, and stream bank stabilization. As noted in the

*Nadira Clarke, Esq.*
*Anne M. Carpenter, Esq.*
*January 17, 2025*
*Page 4*

attached Special Conditions of Probation — Appendix A, this community service payment is due within three business days of entry of the judgment.

The defendant shall not claim, for any tax purpose, that the $500,000 payment made to the Connecticut Statewide SEP Account constitutes a deductible expense or an offset to the defendant's income tax liability. Nor shall the defendant characterize, publicize, or refer to this payment as a voluntary donation or contribution.

The parties further agree that CT DEEP shall have exclusive control over the selection, design, and completion of any projects that may be funded in whole or in part by the defendant's payment. Neither the defendant nor the Government has any rights, interests, or obligations concerning those projects, or any of the facilities, products, and systems that may result from those funded projects.

The payment shall be mailed or personally delivered to the Department of Energy and Environmental Protection, Bureau of Central Services, Accounts Receivable Office, 79 Elm Street, Hartford, Connecticut 06106-5127, and shall be made by certified or bank check payable to the "Treasurer, State of Connecticut," with a notation stating "Statewide SEP Account (South Central Coastal Watershed Enhancement)" and listing the federal docket number for the instant criminal case.

In accordance with Fed. R. Crim. P. 11(c)(1)(C) and (c)(4), if the Court accepts this plea agreement, the Court must include the agreed disposition in the judgment. Pursuant to Fed. R. Crim. P. 11(c)(5), if the Court rejects this plea agreement or the agreed-upon sentencing stipulation, the defendant shall be afforded the opportunity to withdraw its guilty plea. The defendant understands that it has no right to withdraw its guilty plea as long as the Court imposes a sentence consistent with the terms of the stipulated sentence. The defendant further understands that if the Court rejects the plea agreement or the agreed-upon sentencing stipulation, the Government may deem this plea agreement null and void.

Corporate Authorization

The defendant agrees that it will designate a duly authorized representative of the defendant to appear on behalf of the defendant to waive indictment, to enter a plea of guilty, and to receive on behalf of the defendant the imposition of the sentence by the Court. The defendant shall file with the Court an affidavit stating that the corporate representative appearing at the waiver of indictment, guilty plea, and sentencing is fully authorized to act on the defendant's behalf.

Information to the Court

The parties reserve their rights to address the Court with respect to an appropriate sentence to be imposed in this case, which is the sentence set forth above. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation

*Nadira Clarke, Esq.*
*Anne M. Carpenter, Esq.*
*January 17, 2025*
*Page 5*

Officer with access to material in its file, with the exception of grand jury material. The defendant and the Government are amenable to an expedited sentencing in which both parties agree to waive the preparation of the Presentence Report.

## WAIVER OF RIGHTS

The defendant acknowledges and agrees that it is knowingly, intelligently, and voluntarily waiving the following rights:

### Waiver of Right to Indictment

The defendant understands that it has the right to have the facts of this case presented to a federal grand jury, consisting of between sixteen and twenty-three citizens, twelve of whom would have to find probable cause to believe that it committed the offense set forth in the information before an indictment could be returned. The defendant acknowledges that it is waiving its right to be indicted.

### Waiver of Trial Rights and Consequences of Guilty Plea

The defendant understands that it has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent it.

The defendant understands that it has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against it, the right to testify and present evidence, and the right to compel the attendance of witnesses to testify in its defense. The defendant understands that by pleading guilty it waives those rights and that, if the plea of guilty is accepted by the Court, there will not be a further trial of any kind.

The defendant understands that, if it pleads guilty, the Court may ask it, through its representatives, questions about each offense to which it pleads guilty, and if it answers those questions falsely under oath, on the record, and in the presence of counsel, its answers may later be used against it in a prosecution for perjury or making false statements.

### Discovery

The defendant acknowledges that the Government may not have yet produced any or all discovery material, including but not limited to discovery under the Jencks Act, 18 U.S.C. § 3500, the Federal Rules of Criminal Procedure, *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), or the Local Rules of Criminal Procedure, Standing Order on Discovery. The attorneys for the Government are not aware of any information that, in their view, would establish the defendant's factual innocence of the crime to which the defendant is pleading guilty. However, the attorneys for the Government do not warrant that they have reviewed all material in their possession, or that their assessment of the exculpatory nature of information

*Nadira Clarke, Esq.*
*Anne M. Carpenter, Esq.*
*January 17, 2025*
*Page 6*

known to them would be the same as that of the defendant or his counsel. Nonetheless, the defendant acknowledges that (1) it has accepted this Agreement and decided to plead guilty because it is in fact guilty and seeks no further discovery or disclosures of information, and (2) in reaching that decision, it has not relied upon any representations concerning the Government attorneys' assessment of information. On that basis, the defendant waives any and all right to withdraw its plea or attack his conviction, either on direct appeal or collateral attack, on the ground that the Government has not produced any discovery material beyond what already has been produced as of the date of this Agreement. The Government nevertheless will produce, in advance of sentencing, additional material specifically requested by the defendant in connection with any sentencing issue, to the extent that the requested material is in the Government's possession.

<u>Waiver of Statute of Limitations</u>

The defendant stipulates that it has executed knowingly and voluntarily three separate agreements tolling the statute of limitations with the Government while seeking to resolve this criminal matter and negotiating the instant plea agreement. The defendant further agrees that, should the conviction following the defendant's guilty plea be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA

The defendant acknowledges that it is entering into this agreement and is pleading guilty freely and voluntarily because the defendant is guilty. The defendant further acknowledges that it is entering into this agreement without reliance upon any discussions between the Government and the defendant (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the agreed-upon disposition pursuant to Fed. R. Crim. P. 11(c)(1)(C) set forth in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges its understanding of the nature of the offense to which the defendant is pleading guilty, including the penalties provided by law. The defendant also acknowledges its complete satisfaction with the representation and advice received from its undersigned attorneys. The defendant and its undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to it with respect to any civil or

*Nadira Clarke, Esq.*
*Anne M. Carpenter, Esq.*
*January 17, 2025*
*Page 7*

administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant.

## COLLATERAL CONSEQUENCES

The defendant understands that it will be adjudicated guilty of each offense to which the defendant has pleaded guilty and may be deprived of certain rights. The defendant understands that the Government reserves the right to notify any state or federal agency by which the defendant is licensed, or with which the defendant does business.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut for any criminal charges under the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, as a result of the defendant's knowing discharge of a pollutant into Cuff Brook in Cheshire, Connecticut, from July 15, 2019, to July 18, 2019, which forms the basis of the information in this case.

The defendant understands that if, before sentencing, it violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, the defendant will not be permitted to withdraw the guilty plea.

## NO OTHER PROMISES

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

*Nadira Clarke, Esq.*
*Anne M. Carpenter, Esq.*
*January 17, 2025*
*Page 8*

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

HAROLD H. CHEN
ASSISTANT UNITED STATES ATTORNEY

The defendant certifies that National Water Main Cleaning Company and I, on the company's behalf, are authorized to enter into this agreement in accordance with the attached authorization. I have read this plea agreement letter and its attachment(s) and have had ample time to discuss this agreement and its attachment(s) with counsel, and fully understand and accept its terms.

Ari Mervis                                           1/17/25
Chief Executive Officer, Carylon Corporation         Date
Parent Company of
Defendant National Water Main Cleaning Company

I have thoroughly read, reviewed, and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

Nadira Clarke, Esq.                                  1/17/25
Anne M. Carpenter, Esq.                              Date
Attorneys for the Defendant

*Nadira Clarke, Esq.*
*Anne M. Carpenter, Esq.*
*January 17, 2025*
*Page 9*

## STIPULATION OF OFFENSE CONDUCT AND RELEVANT CONDUCT

The defendant, National Water Main Cleaning Company (the "defendant" or "NWMCC"), and the Government stipulate to the following offense conduct and relevant conduct that give rise to the defendant's agreement to plead guilty to the information:

NWMCC is a company based in New Jersey with offices in Connecticut, Massachusetts, and New York. NWMCC provides infrastructure maintenance services, such as pipeline repair and cleaning, to municipalities and utilities, among other clients. Its corporate parent is Carylon Corporation based in Chicago, Illinois. As a corporation, NWMCC is considered a person under the Clean Water Act ("CWA"). *See* 33 U.S.C § 1362(5).

The CWA generally requires a permit for all discharges of pollutants from point sources to waters of the United States. *See* 33 U.S.C § 1311(a). Such permits are typically issued under the National Pollutant Discharge Elimination System ("NPDES") permit program. *See* 33 U.S.C § 1342. Under the CWA, a point source is defined as "any discernible, confined and discrete conveyance"—such as a pipe, conduit, or container—from which pollutants are discharged. *See* 33 U.S.C § 1362(14).

In early 2019, the Town of Cheshire, Connecticut ("Cheshire"), solicited bids for the repair and restoration of a 45-year-old corrugated metal culvert pipe that crossed under Marion Road within town limits. With dimensions of 7 feet wide x 11 feet high x 54 feet long, this culvert pipe directed water flowing from Cuff Brook, a tributary of Tenmile River, beneath Marion Road. Cuff Brook has a natural brook trout population and is considered a "water of the United States" under the CWA. In turn, Tenmile River flows into the Quinnipiac River, which flows into Long Island Sound and the Atlantic Ocean.

The Marion Road project involved, among other things, spraying a three-inch layer of geopolymer mortar onto the pipe's inner surfaces to strengthen and reinforce the culvert pipe. This process of rehabilitating metal culvert pipe is commonly known in the trade as "spincasting." In its uncured state, geopolymer mortar is classified as a hazardous chemical under federal regulations because it is harmful to, among other things, aquatic life. Geopolymer mortar is considered a pollutant under the CWA.

In seeking proposals, Cheshire required that the work be performed under dry conditions with a dewatering/bypass system, so Cuff Brook could flow safely around the project worksite. In March 2019, after submitting the lowest bid, NWMCC executed a written agreement with Cheshire, which included specifications and a site plan prepared by Cheshire. The specifications required a detailed dewatering/bypass system and stipulated that all work would be done under dry conditions. The site plan included erosion and sedimentation controls, such as the installation of an in-stream sump pit, a cofferdam (i.e., an enclosure built within a body of water to allow for drainage), and silt fences to reduce stormwater runoff into Cuff Brook. Cheshire's Public Works and Engineering Department ("Cheshire DPW") submitted the site plan as part of its application to Cheshire's Inland Wetlands and Watercourses Commission ("Cheshire Wetlands

*Nadira Clarke, Esq.*
*Anne M. Carpenter, Esq.*
*January 17, 2025*
*Page 10*

Commission"), which granted a permit to Cheshire DPW for the project. No NPDES permit was either applied for or issued because the project specifications and site plan required NWMCC to take measures to prevent geopolymer mortar from escaping into Cuff Brook.

With a Cheshire DPW representative present each day, NWMCC began the on-site work for the Marion Road project on July 15, 2019. NWMCC sprayed (or "spincast") geopolymer mortar onto the inner walls of the culvert pipe from July 16, 2019, to July 18, 2019. On July 18, 2019, a Cheshire resident with property abutting Cuff Brook observed dead fish and discolored water with an oily sheen in the brook. The resident also reported smelling a chemical odor similar to lighter fluid and contacted the Connecticut Department of Energy and Environmental Protection ("CT DEEP"). Prior to this resident's complaint, NWMCC had made no effort to notify local, state, or federal authorities regarding the discharge of the uncured geopolymer mortar into Cuff Brook.

The subsequent investigation revealed that NWMCC, by and through its employees' actions, violated the Cheshire Wetlands Commission permit, project specifications, and site plan. First, NWMCC did not run bypass pumps according to the project specifications and site plan when spraying geopolymer mortar onto the inner surfaces of the culvert pipe. Second, NWMCC sprayed geopolymer mortar onto the pipe even after NWMCC was informed of heavy rain in the forecast. Photographs show NWMCC workers spraying geopolymer mortar while standing in water flowing through the pipe due to the rain. Third, NWMCC failed to install erosion and sedimentation controls in the work area consistent with the project specifications and site plan, such as a sump pit and cofferdam, that would have prevented the uncured geopolymer mortar from escaping from the worksite. As a consequence of these violations, NWMCC released uncured geopolymer mortar into Cuff Brook, thereby killing more than 150 fish and contaminating the waterway. CT DEEP estimated at the time that Cuff Brook would not return to its prior state for three to five years.

During the project, NWMCC was aware that its environmental controls were deficient, but did not remediate these deficiencies. For example, on the morning of July 17, 2019, Cheshire DPW provided NWMCC a weather forecast for "heavy showers" and "downpours," and advised NWMCC personnel to install a silt fence. NWMCC acknowledged Cheshire DPW's concern, but never installed a silt fence. In fact, when the NWMCC site supervisor informed his NWMCC superiors that he did not have enough time to install a silt fence or other environmental controls, NWMCC did not suspend the project despite the forecasted weather conditions. Similarly, on the morning of July 18, 2019, a Cheshire DPW manager asked NWMCC to install erosion and sedimentation controls, but NWMCC did not install them. The project was stopped only after the Cheshire resident informed CT DEEP about the fish kill, oily sheen, and chemical odor at Cuff Brook.

During the Government's investigation, the NWMCC site supervisor stated that NWMCC had provided him with no environmental training, never informed him that the uncured geopolymer mortar was harmful, and did not provide adequate personnel to work on the Cheshire project. NWMCC terminated him on August 1, 2019. This former site supervisor further stated

*Nadira Clarke, Esq.*
*Anne M. Carpenter, Esq.*
*January 17, 2025*
*Page 11*

that prior to supervising the Cheshire project, his experience with spincasting culvert pipes was limited to two prior projects. On one of these projects, he stated that he had set up a bypass running through the culvert pipe. When a NWMCC executive asked when the job would be completed, the former site supervisor stated that the job was going slowly due to the bypass. Shortly thereafter, the former site supervisor stated that the NWMCC executive dispatched to the job site a more experienced NWMCC site supervisor, who removed the bypass from the pipe. This was the same NWMCC executive who had ultimate supervisory responsibility over the Cheshire project.

The Government's investigation further revealed that, until recently, NWMCC lacked a meaningful and comprehensive environmental training program for its employees, particularly with respect to the CWA, even though NWMCC's core business is repairing and rehabilitating infrastructure that connects directly and indirectly with public waterways. In addition, NWMCC's bonus policy incentivized site supervisors and executives to push their work crews to perform projects quickly and maximize the number of jobs completed. For example, the NWMCC executive responsible for the Cheshire project, as well as the spincasting project discussed in the preceding paragraph, received bonuses in 2021 and 2022 that were 300% greater than his combined annual salary for those two years. Similarly, the experienced NWMCC site supervisor who was brought in to complete the Cheshire project after the fish kill received bonuses that were approximately 150% greater than his combined annual salary in 2021 and 2022. In contrast, NWMCC offered no financial incentive for compliance with environmental requirements.

Notably, NWMCC's CWA violations at Cuff Brook occurred while it was operating under a Code of Conduct, updated in 2015, which was adopted by NWMCC following the development and implementation of a Code of Conduct for NWMCC's business in Massachusetts. This was required as part of a 2014 settlement with the Massachusetts Attorney General's Office to resolve allegations involving, among other things, violations of the Massachusetts Clean Waters Act for discharging sewage and wastewater without a valid permit. NWMCC's Code of Conduct stated in pertinent part:

- "It is our policy to comply with all laws and regulations that apply to our business. Due to the nature of our business, environmental laws and regulations are a predominant concern."

- "We strive to prevent discharges of pollutants to the environment as well to protect our natural resources."

- "If you are involved with processes that affect the environment, such as handling wastes or water discharges, you must be sure to comply with all applicable environmental regulations."

NWMCC acknowledges that its past work practices were at times inconsistent with the CWA. In a separate incident in 2020 in another state, NWMCC released an industrial pollutant into groundwater and contaminated several potable groundwater wells. NWMCC's client was issued a Notice of Violation as a result of this harmful release by NWMCC.

*Nadira Clarke, Esq.*
*Anne M. Carpenter, Esq.*
*January 17, 2025*
*Page 12*

      This written stipulation is part of the plea agreement. The defendant and the Government reserve their right to present additional offense conduct and relevant conduct to the Court in connection with sentencing.

_____
Ari Mervis
Chief Executive Officer, Carylon Corporation
Parent Company of
Defendant National Water Main Cleaning Company

_____
Harold H. Chen
Assistant United States Attorney

_____
Nadira Clarke, Esq.
Anne M. Carpenter, Esq.
Attorneys for the Defendant

*Nadira Clarke, Esq.*
*Anne M. Carpenter, Esq.*
*January 17, 2025*
*Page 13*

## SPECIAL CONDITIONS OF PROBATION — APPENDIX A

### I.    General Terms

National Water Main Cleaning Company ("NWMCC") shall cooperate fully with federal and state environmental officials by complying with all reasonable and lawful requests for inspection, verification, and monitoring of all practices relating to the compliance with environmental laws. NWMCC understands that if it is sold or transferred to another party, the purchaser or successor-in-interest shall be bound by these Special Conditions of Probation.

### II.    Environmental Compliance Program

The defendant shall submit all evidence of its existing environmental regulatory compliance program to the Probation Office and the United States within 30 days after sentencing. If the defendant does not have an environmental regulatory compliance program, or if, in the judgment of the Probation Office and the Government, its existing program is inadequate, the defendant agrees to develop and implement such a program sufficient to satisfy the requirements of U.S.S.G. Chapter 8 concerning effective programs to prevent and detect violations of the law.

### III.    Environmental Compliance Audit

The defendant shall hire an independent outside consultant to perform an environmental audit of its Connecticut facilities. The defendant shall comply with the following requirements concerning the audit:

A.    It shall retain the consultant within 90 days from the date of sentencing. The consultant will follow generally accepted environmental auditing techniques, procedures, and policies in designing, implementing, and executing the audit, including the reporting of deficiencies and corrective measures. The audit will cover all applicable regulated environmental matters at the defendant's Connecticut facilities.

B.    Within 120 days from the date of sentencing, the defendant shall have the consultant prepare a final report of its findings and recommendations which the defendant will furnish to the Probation Department and the United States Attorney's Office within 10 days of its receipt of the final report.

C.    The defendant shall submit a written response to the consultant's recommendations to the Probation Office and the United States Attorney's Office no later than 60 days after receiving the consultant's written report. The response will specify what action the defendant will take to correct any noted deficiencies and regulatory violations, including revisions to the Environmental Compliance Program.

*Nadira Clarke, Esq.*
*Anne M. Carpenter, Esq.*
*January 17, 2025*
*Page 14*

**IV.    Environmental Compliance Manager**

Within 60 days from the date of the sentencing, the defendant shall identify a specific environmental compliance manager for its Connecticut facilities and will ensure that this person has sufficient training, background, and expertise for the job. The job responsibilities of the environmental compliance manager must include environmental compliance. The defendant's environmental compliance manager must have authority to investigate any issues regarding environmental compliance and to report noncompliance directly to the defendant's corporate leadership.

**V.    Resolution of Issues Raised by Connecticut Department of Energy and Environmental Protection, and the Connecticut Office of the Attorney General**

Within 30 days of sentencing, NWMCC shall resolve outstanding claims with the State of Connecticut, Department of Energy and Environmental Protection, and the State of Connecticut, Office of the Attorney General, relating to NWMCC's knowing discharge of a pollutant into Cuff Brook in Cheshire, Connecticut, from July 15, 2019, to July 18, 2019. The resolution will include a payment of $110,000 to the State of Connecticut, Department of Energy and Environmental Protection.

**VI.    Community Service Payment to the Connecticut Statewide Supplemental Environmental Project Account (South Central Coastal Watershed Enhancement)**

The defendant shall make the $500,000 community service payment to the Connecticut Statewide Supplemental Environmental Project Account (South Central Coastal Watershed Enhancement), managed by the Connecticut Department of Energy and Environmental Protection, referenced in this plea agreement within three business days of entry of the judgment.